1 | Nancy Sher Cohen (SBN 081706)
ncohen@proskauer.com
2 | Lary Alan Rappaport (SBN 087614)
lrappaport@proskauer.com
3 | Joshua J. Pollack (SBN 215922)
jpollack@proskauer.com
4 | PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
5 | Los Angeles, CA  90067-3206
Telephone:    (310) 557-2900
6 | Facsimile:    (310) 557-2193

7 | John Failla (applying for *pro hac vice* admission)
jfailla@proskauer.com
8 | Elise Yablonski (applying for *pro hac vice* admission)
eyablonski@proskauer.com
9 | Nathan Lander (applying for *pro hac vice* admission)
nlander@proskauer.com
10 | PROSKAUER ROSE LLP
Eleven Times Square
11 | New York, NY 10036
Telephone:    (212) 969-3000
12 | Facsimile:    (212) 969-2900

13 | Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CV12- 04926 SVW (AJWx)

| | |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, as successor in interest to CHRISTIANA BANK & TRUST COMPANY, as trustee for JOHN DOE TRUST 1, JANE DOE TRUST 2,  JOHN DOE TRUST 3,  JANE DOE TRUST 4, JOHN DOE TRUST 5, JOHN DOE TRUST 6,  JANE DOE TRUST 7, JOHN DOE TRUST 8,  JOHN DOE TRUST 9, JOHN DOE TRUST 10, JOHN DOE TRUST 11, JOHN DOE TRUST 12, JOHN DOE TRUST 13, JOHN DOE TRUST 14, JOHN DOE TRUST 15, JOHN DOE TRUST 16, JOHN DOE TRUST 17, JOHN DOE TRUST 18,  JOHN DOE TRUST 19, JOHN DOE TRUST 20, JOHN DOE TRUST 21, JANE DOE TRUST 22, JOHN DOE TRUST 23, JOHN DOE TRUST 24, JOHN DOE TRUST 25, JOHN DOE TRUST 26, JANE DOE TRUST 27, JOHN DOE TRUST 28, JOHN DOE TRUST 29, JOHN DOE TRUST 30, JOHN DOE TRUST 31, JOHN DOE TRUST 32, JOHN DOE TRUST 33, JOHN DOE | Case No. **COMPLAINT FOR** **1. VIOLATION OF 18 U.S.C. § 1962 (c) (RICO);** **2. VIOLATION OF 18 U.S.C. § 1962 (d) (RICO);** **3. FRAUD;** **4. DECLARATORY JUDGMENT;** **5. BREACH OF CONTRACT;** **6. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** **7. PROMISSORY ESTOPPEL;** **8. VIOLATION OF THE CONNECTICUT UNFAIR TRADE** |

TRUST 34, JOHN DOE TRUST 35, JOHN DOE TRUST 36, JANE DOE TRUST 37, JOHN DOE TRUST 38, JOHN DOE TRUST 39, JANE DOE TRUST 40, JOHN DOE TRUST 41, JANE DOE TRUST 42, JANE DOE TRUST 43, JOHN DOE TRUST 44, JOHN DOE TRUST 45, JOHN DOE TRUST, 46 JANE DOE TRUST 47, JOHN DOE TRUST 48, JOHN DOE TRUST 49, JOHN DOE TRUST 50, JOHN DOE TRUST 51, JANE DOE TRUST 52, JANE DOE TRUST 53, JOHN DOE TRUST 54, JOHN DOE TRUST 55, JOHN DOE TRUST 56, JANE DOE TRUST 57, JOHN DOE TRUST 58, JANE DOE TRUST 59, JOHN DOE TRUST 60

Plaintiffs,

vs.

PHL VARIABLE INSURANCE COMPANY, PHOENIX LIFE INSURANCE COMPANY, and THE PHOENIX COMPANIES, INC.

Defendants.

PRACTICES ACT; AND

**9. VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**

**JURY TRIAL DEMANDED**

Plaintiffs John Doe Trust 1, Jane Doe Trust 2, John Doe Trust 3, Jane Doe Trust 4, John Doe Trust 5, John Doe Trust 6, Jane Doe Trust 7, John Doe Trust 8, John Doe Trust 9, John Doe Trust 10, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 16, John Doe Trust 17, John Doe Trust 18, John Doe Trust 19, John Doe Trust 20, John Doe Trust 21, Jane Doe Trust 22, John Doe Trust 23, John Doe Trust 24, John Doe Trust 25, John Doe Trust 26, Jane Doe Trust 27, John Doe Trust 28, John Doe Trust 29, John Doe Trust 30, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 34, John Doe Trust 35, John Doe Trust 36, Jane Doe Trust 37, John Doe Trust 38, John Doe Trust 39, Jane Doe Trust 40, John Doe Trust 41, Jane Doe Trust 42, Jane Doe Trust 43, John Doe Trust 44, John Doe Trust 45, John Doe Trust 46, Jane Doe Trust 47, John Doe Trust 48, John Doe Trust 49, John Doe Trust 50, John Doe Trust 51, Jane Doe Trust 52, Jane Doe Trust 53, John Doe Trust 54, John Doe Trust

1

55, John Doe Trust 56, Jane Doe Trust 57, John Doe Trust 58, Jane Doe Trust 59, and John Doe Trust 60, by and through Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company, as trustee ("Plaintiffs" or the "Trusts") [1] allege as follows:

## NATURE OF THE ACTION

1.     PHL Variable Insurance Company ("PHL"), Phoenix Life Insurance Company ("Phoenix Life"), and their parent the Phoenix Companies, Inc. ("PNX") (collectively "Defendants") boast on their website that they have a "History of keeping our promises since 1851."    Contrary to this self-serving assurance Defendants provide to California residents and the general public, since in or about 2009 when Defendants' financial position was devastated by the global financial crisis and Defendants' own grossly incompetent management of their financial affairs, Defendants have broken their promises to policyholders at every opportunity and perpetrated a widespread and massive fraud upon their policyholders. Defendants have conspired together and engaged in this fraudulent scheme in an effort to ensure their own survival, thus placing their own interests above those of their policyholders.    By this action, Plaintiffs seek to recover damages from Defendants for the financial harm caused by Defendants' wrongful conduct and enjoin Defendants from engaging in such conduct in the future.

2.     As detailed below, Defendants have conspired together and secretly instituted a scheme in which they will ultimately deny coverage under many *billions* of dollars of life insurance policies issued by PHL and Phoenix Life, including the $466.9 million in life insurance policies issued to Plaintiffs by PHL that is the subject of this action.    Defendants' conduct presents an extreme and egregious example of insurer bad faith.   But Defendants have not stopped there.  Desperate to

---

[1] The Trusts are suing by fictitious names to protect the privacy of the individual insureds who formed them and whose names the Trusts bear.  The true names of each Trust is known to the parties.  Identifying information for the life insurance policies issued to the Trusts (the policy number, issue date and face amount) is alleged below.

continue profiting from policies they have no intention of ever honoring, Defendants have engaged in a fraudulent and illegal pattern of racketeering activity in which they have defrauded Plaintiffs and other policyholders into paying hundreds of millions of dollars in premium revenue under policies that Defendants secretly plan to later reject as being invalid.   At all relevant times herein, Defendants have conducted the affairs of PNX's Life and Annuity segment (the "Enterprise") through a pattern of racketeering activity that has systematically defrauded and continues to defraud Plaintiffs and other policyholders.

3.   Plaintiffs are life insurance trusts.  Each Trust owns a life insurance policy issued by PHL (the "Policies").   The total face amount of the Policies is $466.9 million.  Each Trust was formed by the individual whose life is insured by the Policy owned by that Trust for the purpose of owning an insurance policy on his or her life.  As was their right under the Policies and applicable law, the beneficiary of each Trust (a family member of the insured) later sold his or her beneficial interest in the Trust to a third party for consideration.  Although such transactions were permitted by the terms of the Policies and applicable law, and were actively encouraged by Defendants when the transactions occurred, PHL, as part of a fraudulent scheme and concerted effort with Phoenix Life and PNX, has: (i) implemented a practice of denying benefits under similar policies, thus destroying the Policies' value; (ii) engaged in a widespread and successful practice of defrauding its policyholders into paying premiums on policies PHL does not intend to honor; and (iii) breached the Policies and the duty of good faith and fair dealing implied therein in a concerted effort to intimidate Plaintiffs into allowing their Policies to lapse for no consideration, so that Defendants can use the resulting windfall profit to try to rescue themselves from their own financial mismanagement.

4.   Plaintiffs own the Policies and continue to be billed by and pay substantial premiums to PHL.  To date, PHL has collected more than $44,000,000 in premiums from Plaintiffs for the Policies.  Despite continuing to charge and collect

premiums for the Policies, PHL's conduct, in concert with PNX and Phoenix Life, has made clear that PHL has no intention of willingly paying claims under the Policies when the insureds ultimately die and benefits become due.  Instead, PHL, as part of a plan and scheme with Phoenix Life and PNX, has engaged in a course of conduct of systematically denying claims for benefits under policies owned by trusts when, as here, the beneficial interest in the trust has been transferred to a third party for consideration.  Specifically, when a large death claim is submitted for payment by a trust, PHL refuses to promptly pay the claim after receiving due proof of death – which is all that is required by the terms of the policy for the death benefit to be paid.   Disregarding its contractual and legal obligations, PHL improperly and without any basis requires that the trust complete a form requesting various information about any transfer of the beneficial interest in the trust and the identity of any new beneficiary.  In classic "Catch-22" fashion: (i) if the trust refuses to complete the form, PHL denies the claim; and (ii) if the trust completes the form, and indicates a transfer has occurred, PHL denies the claim.  In short, if a transfer of the beneficial interest in the trust owning the policy has occurred, PHL denies the claim on the purported (and erroneous) basis that, if a transfer has occurred, the policy is what PHL considers to be a so-called investor-originated life insurance ("IOLI") policy and therefore, according to PHL, lacks a valid insurable interest.

5.     This practice of denying claims when a beneficial interest transfer has occurred is part of Defendants' practice of denying claims whenever an "investor" has acquired either a policy issued by PHL or Phoenix Life or an interest in the entity owning such policy.  Indeed, Defendants' practice extends to denying claims under policies transferred to investors even when: (i) PHL or Phoenix Life explicitly approved the transactions in advance; and/or (ii) PHL or Phoenix Life had knowledge of the relevant transfer for years, yet continued to bill and accept premiums.

6.     PHL's intention to not honor the Policies also is apparent from PHL's

4

attempts to rescind five different life insurance policies owned by trusts for which Wilmington Savings Fund Society, FSB ("Wilmington Savings"), as successor-in-interest to Christiana Bank & Trust Company ("Christiana Bank"), serves as trustee (including three of the Policies at issue here) on the ground that those five policies purportedly lack an insurable interest due to transfers of the beneficial interest in the trusts. PHL's position is contrary to applicable law, which explicitly provides that an insurable interest need only exist at policy inception and policies (and interests in trusts that own policies) are freely transferable after inception. Moreover, Plaintiffs are informed and believe that Defendants have identified the Policies as ones which they later intend to have PHL challenge when a death claim is submitted.

7.     As a further demonstration of PHL's bad faith, when PHL denies claims for benefits based on the transfer of a policy or beneficial interest, PHL not only seeks to rescind the policy, but also attempts to confiscate and retain all of the premiums collected for that policy. PHL's practice is contrary to law as well as the terms of PHL's policies, which expressly state that PHL will return premiums in the event that it successfully contests the policy's validity.   PHL's practice also gives Defendants an incentive to conceal PHL's true intentions from Plaintiffs and other policyholders and bill and collect as much in premiums as possible before challenging a policy's validity.

8.     PHL's purported concern about IOLI not only is factually and legally incorrect, particularly where, as here, the transactions complied with the Policies' terms and applicable law, but it also is contradicted by Defendants' conduct.   For years, Defendants embraced the sale of their policies to investors on the same "secondary market" that they now cite as a pretext for attempting to rescind policies. Defendants knowingly issued policies for "resale" in the secondary market, and encouraged their sales force to seek out such business, to boost Defendants' short term profits, provide dividends for PNX's shareholders, and enrich Defendants' management and sales force.   Defendants' management encouraged employees to

"crank out" this type of business and "bring it on," stating "the more the merrier."

9.     One former employee has candidly admitted that: (i) as much as 80% of Defendants' life insurance business was what Defendants now denounce as IOLI; (ii) Defendants' managers encouraged the solicitation of such business and taught employees how to find such business; and (iii) PNX's CEO would have had to have had a "learning disability" to not know that IOLI had become Defendants' core business.   Another former employee has admitted that: (i) his compensation rose from $75,000 in 2004 to $1.8 million in 2006 as a result of the sale of policies Defendants now denounce as IOLI; (ii) he generated as much premium revenue as some entire life insurance companies due to the sale of such policies; (iii) Defendants implemented sales quotas which were impossible to meet without selling such policies; and (iv) it "doesn't take a rocket scientist to figure out what was happening" in Defendants' life insurance operations.   Defendants succeeded in becoming a primary seller in the lucrative and burgeoning secondary market. Defendants also became an active buyer of policies on the secondary market, forming a subsidiary, Phoenix Life Solutions, dedicated to the purchase and origination of policies on the secondary market.

10.     Now, however, because of Defendants' dire financial situation and concern that they will be unable to meet contractual obligations as they become due, Defendants no longer embrace the secondary market, and instead routinely deny coverage and seek to rescind policies their policyholders sold to investors on the pretext that such policies lack an insurable interest.   Defendants' changed financial circumstance, rather than any good faith concern about the legitimacy of the policies Defendants eagerly marketed and knowingly issued, is the motivation for Defendants' improper attempts to avoid their contractual obligations.

11.     Defendants have wrongfully decided they will not honor the Policies and other similar policies and conspired to commit a brazen fraud upon Plaintiffs and other policyholders.   The purpose of this scheme is to defraud Plaintiffs and

other policyholders into continuing to pay premiums for policies that PHL has no intent of honoring.  By doing so, PHL continues to generate substantial premium revenue which, in turn, gives the investing public the false impression that Defendants' financial position is more sound than it is in fact.  Defendants' scheme also is designed to maximum the premiums collected before PHL denies a claim, attempts to rescind the Policy and seeks to retain premiums.

12.    In furtherance of Defendants' fraudulent scheme, PHL has represented to Plaintiffs and other policyholders that their policies are in force and in good standing while concealing PHL's true intention to deny coverage and attempt to confiscate premiums.   Despite secretly planning to deny coverage under the Policies, Defendants have conspired to defraud Plaintiffs into continuing to pay premiums by having PHL mail and/or fax Plaintiffs fraudulent communications indicating that the Policies are valid and in force while concealing PHL's true intentions.  PHL has sent Plaintiffs hundreds of such fraudulent communications, including premium notices, annual summaries, policy illustrations, verifications of coverage, and responses to Policy audit requests.  Defendants' illegal scheme has reaped hundreds of millions of dollars from policyholders, including tens of millions of dollars from Plaintiffs.

13.    After fraudulently inducing Plaintiffs and other policyholders into paying hundreds of millions of dollars in premiums for policies that Defendants do not intend to honor, Defendants have engaged in a concerted effort to force the same policyholders to lapse their policies, so that Defendants can retain the ill-gotten premiums without having to deny coverage and try to defend their actions in court.  PHL has taken several actions directly breaching the terms of the policies and violating its duty of good faith to Plaintiffs and other policyholders.

14.    PHL has breached the Policies by impermissibly raising the cost of insurance ("COI") charges for the Policies.  PHL also has breached the Policies by impermissibly attempting to restrict Plaintiffs' contractual right to transfer the

Policies and the right to transfer the beneficial interests in the Plaintiff Trusts. PHL has taken these actions as part of a plan by Defendants to intimidate Plaintiffs and other policyholders into allowing their policies to lapse.

15. Each of the Policies is a premium-adjustable, universal life insurance policy. The principal benefit of such policies is that, unlike whole life insurance, universal life insurance allows the policyholder to pay the minimum amount of premiums necessary to keep the policy in-force; the premiums paid need only be sufficient to cover the COI charges and certain other specified expense charges. Any premiums paid in excess of the COI charges and expense components are applied to a policy's "accumulated value" or "policy value," which earns interest. Defendants promoted these flexible-premium policies as "appropriate for those looking to minimize long term insurance costs" because they "present the opportunity to pay lower premiums, as well as adjust the amount and timing of premium payments."

16. Having marketed such policies as enabling policyholders to minimize their premium payments and keep policy values as low as possible, Defendants now are trying to punish Plaintiffs and other policyholders for doing so. PHL and Phoenix Life have drastically increased their COI rates where policyholders have exercised their contractual right to keep accumulated policy values low. This behavior by PHL and Phoenix Life is a breach of the express terms of the insurance contracts, as wells as bad faith conduct in furtherance of Defendants' overall scheme and campaign to destroy the value of policies and intimidate policyholders into lapsing their policies.

17. As California courts have recognized, it is illegal for an insurer to base COI increases on anything other than the factors specified in the policies. *See, e.g., Yue v. Conseco Life Ins. Co.*, No. CV 08-1506, 2011 (C.D. Cal. Jan. 19, 2011*); In re Conseco Life Ins. Co. Cost of Ins. Litigation*, No. ML 04-1610, 2005 WL 5678842 (C.D. Cal. 2005). By raising COI rates based on accumulated policy values, PHL

has breached the Policies.  Additionally, the Policies expressly prohibit PHL from discriminating unfairly within any class of policyholders with respect to COI rates.  Yet, PHL has publicly admitted that its COI increases are directed only at a certain subset of policies within the same class.

18.   PHL's COI increases were done in bad faith and for a prohibited purpose.  By increasing COI rates based on accumulated policy value, PHL is attempting to force Plaintiffs and other policyholders to either pay excessive premiums which will not justify the death benefit or lapse their policies and forfeit the premiums to PHL.  This is a quintessential example of insurer bad faith.

19.   PHL has also unlawfully, and in violation of the Policies' terms, sought to restrict Plaintiffs' ability to transfer the Policies or interests in the Trusts.  The Policies expressly state that the Trusts have the right to transfer or assign the Policy.  This is an important and valuable feature of the Policies which was marketed by PHL and its agents.  The Policies do not restrict or dictate the circumstances in which beneficial interests in the entities owning the Policies can be transferred.

20.   Nevertheless, and contrary to the terms of the Policies, PHL has demanded that it be advised of, and approve, any transfers of beneficial interests in the Trusts and threatened to deny coverage if transfers are made without its approval.  PHL's conduct is a breach of both the express terms of the Policies and the covenant of good faith and fair dealing implied therein.

21.   PHL and Phoenix Life routinely deny requests to change the ownership of policies even though the policies expressly permit ownership to be changed at any time.  Plaintiffs are informed and believe, and upon such information and belief allege, that PHL and Phoenix Life have done so in a deliberate and wrongful attempt to destroy the value of PHL and Phoenix Life policies on the secondary market.  Numerous policyholders have sued PHL and Phoenix Life over such conduct.

22.   Defendants have, in effect, declared "war" against PHL's and Phoenix Life's policyholders.  Defendants engage in a self-serving strategy in which they

1  attempt to cast PHL and Phoenix Life policyholders as villains and themselves as
2  victims who innocently issued policies they do not intend to honor.  Among other
3  things, PHL files objectively baseless separate actions on individual policies in the
4  hope that PHL can persuade the court that it was tricked into issuing the policy.  In
5  truth, the policies Defendants now label "IOLI" were Defendants' *core business* for
6  several years.  PHL and Phoenix Life issued *billions* of dollars of the policies which
7  Defendants now claim are illegal.  These policies enriched Defendants' executives
8  and sales force, and comprised the core of Defendants' life insurance business.
9  Defendants cannot in good faith contend that they did not intentionally market and
10 issue policies which Defendants knew would be sold to investors on the secondary
11 market, or owned by trusts in which the beneficial interest would be sold to
12 investors.

### THE PARTIES

13 
14     23.    Wilmington Savings, as successor-in-interest to Christiana Bank, as
15 trustee for Plaintiffs, is a Delaware citizen which has its principal place of business
16 at 500 Delaware Ave., Wilmington, DE 19801.

17     24.    Upon information and belief, PHL is a corporation organized under the
18 laws of the State of Connecticut, with its principal place of business located in
19 Hartford, Connecticut.  At all relevant times herein, PHL was and is licensed to
20 transact, and was transacting, insurance business in the State of California and this
21 judicial district.  PHL is an indirect wholly owned subsidiary of Phoenix Life.

22     25.    Upon information and belief, Phoenix Life is a corporation organized
23 and existing under the laws of New York, having its principal place of business in
24 East Greenbush, New York.  At all relevant times herein, Phoenix Life was and is
25 licensed to transact, and was transacting, insurance business in the State of
26 California and this judicial district.  Phoenix Life is a wholly owned subsidiary of
27 PNX.

28

26.   Upon information and belief, PNX is a publicly traded Delaware corporation and a holding company.   PNX's principal operating subsidiaries, Phoenix Life and its indirect subsidiary PHL, provide life insurance and annuity products in California and this judicial district.   PHL and Phoenix Life are part of the PNX operational business segment known as the "Life and Annuity segment."

## JURISDICTION AND VENUE

27.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this Complaint alleges claims for relief arising under the Racketeer Influenced and Corrupt Organizations ("RICO") law, 18 U.S.C. §§ 1962 (c) and (d).

28.   This Court has personal jurisdiction over defendants PHL and Phoenix Life, as among other reasons, they are licensed to issue insurance coverage in California and have made continuous and systematic contacts with California.   This Court has personal jurisdiction over defendant PNX because, among other reasons, its principle operating subsidiaries, Phoenix Life and its indirect subsidiary PHL, are licensed to issue insurance coverage in California and because PNX has made continuous and systematic contacts with California.   PHL issued many of the Policies: (i) to trusts formed in California within this judicial district; (ii) on the lives of California citizens who reside within this judicial district; and/or (iii) through licensed and appointed California agents of PHL and Phoenix Life doing business within this judicial district.

29.   Venue is proper is this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.   PHL issued many of the Policies: (i) to trusts formed in California within this judicial district; (ii) on the lives of California citizens who reside within this judicial district; and/or (iii) through licensed and appointed California agents of PHL and Phoenix Life doing business within this judicial district.   Plaintiffs are informed and believe, and upon such information and belief allege, that those insurance agents also prepared or assisted in many of the fraudulent communications alleged herein.

11

## FACTUAL ALLEGATIONS

### Defendants

30.    PNX is a holding company whose subsidiaries sell life insurance, annuities, and other products.  PNX's 2011 Annual Report describes two distinct operational business segments: a "Life and Annuity segment" and a "Saybrus segment."  The two principal life insurance company subsidiaries of PNX, which sell products for the "Life and Annuity segment," are PHL and Phoenix Life.

31.    Because PNX is a holding company, its ability to meet its obligations and to pay shareholder dividends is dependent upon dividends and other payments received from PHL, Phoenix Life and other operating subsidiaries.  Based upon public filings, Phoenix Life pays dividends directly to PNX, and PHL pays hundreds of millions in fees to Phoenix Life annually which, in turn, are used to fund Phoenix Life's dividend payments to PNX.  Thus, the financial success of PNX, and its ability to pay shareholder dividends, is directly tied to and dependent on the financial success of PHL and Phoenix Life.

32.    Plaintiffs are informed and believe, and upon such information and belief allege, that Defendants' life insurance business declined during the years prior to 2004.  In order to grow their business, gain profit for their shareholders, and earn bonuses for their sales force, Defendants needed to find a way to compete with larger, more established insurers in the most profitable market segments. Defendants' primary target market was selling high face value policies to wealthy, elderly insureds because such policies generated premiums that were significantly larger than the premiums generated by the policies sold in the markets Defendants had traditionally serviced.  The burgeoning "secondary market" for life insurance, and the increased demand for large life insurance policies among the senior population, provided the opportunity Defendants needed to enter and compete in the market they coveted.

12

### The Secondary Market For Life Insurance

33.     For decades, the life insurance industry paid relatively few death claims because the majority of life insurance policies lapsed (*i.e.*, the policy owner ceased paying premiums) before the insured's death.   The primary reason for a policy owner to let a policy lapse was that, after owning a policy for some amount of time, the owner no longer was able to, or no longer wanted to, continue paying premiums.   Before the development of a "secondary market" for life insurance policies, an insured's only alternative to paying premiums or letting a policy lapse was to surrender the insurance policy to the insurer for a modest cash value, thus relinquishing a potentially valuable asset for little or nothing.   Insurers received a tremendous windfall as they collected premiums yet infrequently paid death benefits.   This state of affairs resulted in a tremendous windfall to insurers, as they were able to retain premiums paid by all policyowners while only infrequently paying out death benefits.

34.     The secondary market developed as a direct response to this imbalance of power between insurers and policyholders.   Investors who purchase policies from insureds in the secondary market provide insureds with an option to sell their policies to investors rather than simply surrendering their policies to the insurer or letting the policies lapse.   According to a recent GAO report, policy owners who sold their policies on the secondary market received approximately eight times the cash surrender value that they would have received from their insurers.

35.     Additionally, insureds often form insurance trusts for the purpose of owning insurance policies on their lives and name themselves or family members as the beneficiaries of such insurance trusts.   When a policy is owned by an insurance trust, the insured and his or her family have the option of later selling their interests in the trust (as opposed to the policy) on the secondary market.

36.     Although some insurers, as a scare tactic, have characterized the secondary market for life insurance policies as "wagering on human life," the

13

secondary market provides an important service to insureds: a means by which to sell a valuable asset (an insurance policy or an interest in an insurance trust) and thus monetize their policy or interest in a way that best serves their needs and benefits their families.  Insurers who object to the secondary market are motivated solely by their own bottom line, not any professed concern regarding "wagering." An investor who buys a policy on the secondary market or an interest in the trust that owns such policy is unlikely to let the policy lapse.  Thus, when a policy or interest in an insurance trust is sold to an investor, the insurer is more likely to have to pay the death benefit.  Insurers who dislike the secondary market do so because it ensures they will have to honor their promise in the insurance policies they issue – pay death benefits for which they have received premiums.

37.    Plaintiffs are informed and believe, and upon such information and belief allege, that, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies on the lives of wealthy seniors.  These policies were significantly more expensive than most policies and, correspondingly, generated significantly more premium revenue for the insurer.  Plaintiffs are further informed and believe, and upon such information and belief allege, that, this growth was primarily attributable to the expansion in the secondary market.  The knowledge that a policy could potentially be sold for a profit, rather than lapsed or surrendered to the insurance company, led many seniors to purchase policies as an investment that could potentially be sold for a profit and benefit their family.  The fact that the growth in the secondary market was driving increased demand for high face amount policies insuring the lives of seniors was commented upon frequently within the insurance industry and was well known to all major life insurers.  Similarly, the fact that insureds were forming trusts to own insurance policies on their lives, with the possibility that the beneficial interest in the trusts would later be sold, also was well known and frequently discussed in the insurance industry.

14

38. This increased demand by seniors for large face amount policies which could be sold to a third party on the secondary market provided insurers with an opportunity for significant revenue. However, because such policies were unlikely to lapse or be surrendered, certain insurers believed the policies ultimately would not be profitable and decided not to sell them. As early as 2005, certain life insurers had developed pejorative terms, such as IOLI, to describe life insurance policies which they believed were being procured for the purpose of resale to investors.

39. By contrast, other insurers, including PHL and Phoenix Life, were eager to obtain a share of the premium revenue from the increased demand for high face amount policies insuring the lives of seniors. These insurers actively embraced the secondary market and the underlying transactions. Defendants were among the insurers who most eagerly embraced the new potential revenue available as a result of the secondary market.

40. In order to increase their sales in the affluent senior market and fully capitalize on the potential new sales the secondary market offered, certain insurers like PHL and Phoenix Life, and their agents, promoted and marketed several types of transactions which made it easier for insureds to procure policies with the possibility of resale, thus increasing sales and premium revenue for the insurer. For instance, many of the policies sold by PHL, Phoenix Life and other insurers were financed through an arrangement called non-recourse premium financing. Under such an arrangement, a lender would loan the insured funds to pay premiums in exchange for the insured pledging the policy as the sole collateral for the loan. When the loan expired, usually 24 to 27 months after policy issuance, many insureds would elect to transfer ownership of the policy to the lender. These arrangements were known in the insurance industry and heavily marketed by insurers like PHL and Phoenix Life because they: (i) allowed insureds to purchase large policies without any cash outlay; and, (ii) in turn, allowed the insurers to sell more and larger policies.

15

41.     Another option that arose was for an insured to establish a life insurance trust to own a policy on his or her life and name a family member as the beneficiary of the trust, thereby giving the beneficiary the option of selling his or her beneficial interest to an investor.  Such transactions could lawfully be accomplished in many states, like California, and were encouraged and promoted by insurers, like PHL, Phoenix Life and their agents.

42.     Still another option that insurers like PHL and Phoenix Life gave to insureds was the utilization of an annuity purchased with loaned funds to finance the premiums for a life insurance policy.  Under this type of arrangement, the annuity would be sufficient to pay the premiums and interest to the lender, and the death benefit would later be divided by the insured and the lender.

43.     Due to these various arrangements, in which investors were likely to obtain an interest in the policy proceeds, insurance companies like PHL and Phoenix Life were able to sell a larger number of high face value polices and thus significantly increase their premium revenue and PNX's revenue.  Defendants were fully aware of these various transactions and actively promoted them through their agents and sales force.

**Defendants Embrace And Profit From The Secondary Market**

44.     During the time period from 2005 to 2007, Defendants engaged in an aggressive campaign to sell high face amount policies to elderly insureds in order to generate high premium revenue.  Upon information and belief, Defendants even encouraged their agents to ask elderly insureds to purchase even larger policies than they had initially applied for so as to increase the premium revenue paid to Defendants.  Upon information and belief, Defendants' products were priced such, and issued in such large face amounts (often at Defendants' urging), that resale of the policies was virtually inevitable.

45.     Defendants were not, as they now claim, actually concerned whether the policies they would issue were likely to be sold into the secondary market after

16

issuance. To the contrary, because Defendants wanted to increase their premium revenue, Defendants actively solicited insurance agents and other producers to offer life insurance products that were likely to be sold into the secondary market.

46.    One former employee of Defendants, James Michael Max Labar, testified that although PNX's CEO sometimes made self-serving statements to shareholders that Defendants were not selling so-called IOLI, "privately it was a different matter" as employees were told to "bring it on" and "crank it out." Defendants' regional sales managers encouraged employees to seek out so-called IOLI business from insurance agents, explaining "that's where you're going to make the money." Employees who refused to participate in seeking out this business would either "fail," "leave" or "be fired." Mr. Labar admitted under oath that approximately 80% of Defendants' life insurance sales during the relevant time period were likely what Defendants now calls IOLI and that this practice was so "blatant" that PNX's CEO and Defendants' upper management would have had to have had a "learning disability" to not know that Defendants' life insurance business was largely IOLI.

47.    Defendants were concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly individuals. As part of their plan to capture market share in the burgeoning market, Defendants solicited producers to offer products that many other insurers would have considered IOLI. Defendants' goal was to maximize premium revenue, which in turn would generate bonuses for their agents, sales force and personnel. On information and belief, the increased premium revenue also was intended to create an appearance to the investing public, rating agencies, and prospective policyholders, including Plaintiffs, that Defendants were growing and keeping pace with their competitors. In reality, such premium revenue was attributable to the sale of policies like the ones sold to Plaintiffs, which Defendants now disavow.

48.     As a result of Defendants' embracement of the secondary market, PHL's and Phoenix Life's life insurance sales increased dramatically in 2005, which Defendants acknowledged was a direct result of their having accepted significant amounts of one form of business which they now characterize as IOLI: namely, non-recourse premium financing.   The head of Defendants' life insurance sales told employees that Defendants' business philosophy with respect to policies sold pursuant to non-recourse premium financing was "the more the merrier." Defendants even created a "user guide" related to non-recourse premium financing, which detailed different programs available so that their employees could best take advantage of this market.

49.     Even after many of their competitors denounced non-recourse premium financing as IOLI, Defendants continued accepting such business and, even after deciding to stop accepting future non-recourse business, Defendants "grandfathered" significant amounts of pending non-recourse business so as to be able to gain the significant premiums from the pending business and boost Defendants' own financial position.   Although Defendants ultimately ceased accepting non-recourse premium financing business, they continued to actively seek and accept other applications for policies which they believed were likely to be sold to investors.

50.     Defendants' life insurance sales continued to increase dramatically in 2006 and 2007.  This increased business was directly tied to Defendants' and their agents' heavy marketing and solicitation of business which they now claim was impermissible IOLI.   Upon information and belief, the majority of new premium revenue that Defendants earned in 2005-2007 came from policies later sold to investors or owned by entities in which investors later purchased interests.   In several instances, Defendants sold hundreds of millions of dollars of such policies through individual agents.   Defendants sold many billions of dollars worth of policies they now characterize as being IOLI.

51.   One of Defendants' former employees, Ed Humphrey, testified regarding this explosion in sales created by Defendants actively and aggressively selling policies destined to be sold on the secondary market.   Mr. Humphrey testified that he was required to meet a $2 million quota for premiums generated in 2005.   Due to Defendants' marketing and solicitation of policies sold using non-recourse premium financing, Mr. Humphrey was able to generate $7.5 million in premiums, nearly four times his $2 million quota.   According to Mr. Humphrey's testimony, policies sold using non-recourse premium financing accounted for at least 90 percent of his business.   Defendants raised Mr. Humphrey's quota to $8 million in premiums for 2006.   By continuing to bring in business which had all of the "earmarks" of policies which were likely to be sold into the secondary market, Mr. Humphrey alone generated *$36 million* in premium in 2006.   Mr. Humphry's $36 million in premium was more than the total premium generated by several top 100 life insurance companies.   Defendants raised Mr. Humphrey's premium quota to $20 million in 2007, which he met again.   As Mr. Humphrey explained, the quotas set by Defendants for their employees were impossible to meet without selling policies intended to be sold in the secondary market (*i.e.*, policies Defendants now denounce as IOLI).   As Mr. Humphrey aptly put it, it "doesn't take a rocket scientist to figure out what was happening" at PNX and its subsidiaries PHL and Phoenix Life.

52.   Plaintiffs are informed and believe, and upon such information and belief allege, that, in order to support its sales efforts in the senior market and maximize the issuance of high face value policies to seniors, PHL deliberately relaxed and disregarded its underwriting standards and requirements, and pressured its underwriters to approve policies, so that PHL could generate as much premium revenue as possible.   Plaintiffs are further informed and believe, and upon such information and belief allege, that, PHL did not care about the accuracy of application information submitted by its agents, or about obtaining additional

information or follow-up, because it was entirely indifferent to such information. Rather, PHL cared only about receiving premiums by having policies approved and issued. This "anything goes" underwriting philosophy by PHL extended not only to issues regarding the potential future sale of the policy (which PHL encouraged), but also to issues related to potential insureds' financial and medical status. Indeed, Defendants' "aggressive underwriting" was even commented on by financial analysts, who noted that Defendants were likely approving policies their competitors would not in order to compensate for Defendants' comparably low financial ratings.

53. This consciously lax underwriting by PHL went hand-in-hand with its aggressive sales approach in the lucrative senior market. An insurer who performs rigorous underwriting must reject a high percentage of applications and thus sacrifice short term profits for long term stability. PHL had no interest in such an approach, as it cared only about generating significant premium revenue so that it could boost its short term profits, improve its financial ratings, and enrich its executives and sales force. Its goal was to sell as many large policies as possible and its deliberately relaxed, permissive, and inattentive underwriting was an essential part of that strategy.

54. PHL's underwriters either did not care about whether or not the policies being issued by PHL would later be sold on the secondary market, or they succumbed to Defendants' marketing pressure and disregarded such information. PHL's underwriters disregarded potential "red flags" that might have caused other insurers, who did not wish to participate in the market, to decline policies. Plaintiffs are further informed and believe, and upon such information and belief allege, that PHL's underwriters were under tremendous internal pressure to approve large policies and risked reprimand and possible dismissal if they rejected a policy and thus cost PHL business or jeopardized their colleagues' bonuses and compensation. The guiding philosophy and goal was to earn as much premium revenue as possible. PHL's underwriters performed their jobs according to Defendants' mission and

strategy, approving policies regardless of any questions, concerns or red flags raised in the application file.

55.     Whether due to their indifference or Defendants' marketing pressure, PHL's underwriters were lax in investigating the financial status and medical history of elderly applicants for large face value life insurance policies.  PHL did little, if any, due diligence to verify the accuracy of the financial and medical information submitted by its agents.  By way of example, former PHL employee, Mr. Labar, testified that PHL made no effort to verify financial information submitted regarding insureds.  According to Mr. Labar, PHL only cared about having any financial information at all so that it could claim, contrary to the facts, that it had performed "due diligence."  Mr. Labar also testified that PHL underwriters routinely provided better ratings to insureds based on their medicals than did other insurers and that PHL's underwriters did this because of internal pressure at PHL to approve policies.

56.     At least one example of PHL's deliberate disregard of any underwriting standards is available in the public record in *PHL Variable Insurance Company v. Faye Keith Jolly*, Case No. 08-cv-3220, United States District Court for the Northern District of Georgia (the "Jolly case").

57.     According to publicly filed documents in the Jolly case, PHL issued a $10 million insurance policy on a man named Keith Jolly, based on information submitted by PHL' agents claiming that Mr. Jolly was a billionaire who had amassed his fortune by discovering emeralds in a sunken Spanish armada.  Medical records PHL received, however, indicated that the supposed billionaire actually worked at a cemetery

58.     If the story told by PHL's agents had been true, PHL's underwriters could, of course, have confirmed the story with even the most cursory internet search.  Had they done such a search, however, rather than seeing any confirmation of sunken treasure, they would have discovered that the insured was instead a repeat felon with little or no assets.

21

59.    PHL's shockingly poor underwriting in the Jolly case has, much to PHL's embarrassment, received significant media attention.  One media outlet, the *Hartford Courant*, astutely noted: "But at the heart of the story, as pieced together through court records, is the question of how Phoenix could have approved the policy in the first place.  Jolly's application contained wild discrepancies and claims, many easily debunked."  PHL refused to comment to its hometown newspaper as to "why the company accepted Jolly's application despite such glaring discrepancies."

60.    The answer to the question raised by PHL's hometown paper lies in PHL's unrelenting push to sell as many large policies as possible so as to boost its premium revenue.  In pursuit of this goal, PHL was willing to issue policies regardless of the fact that they would be sold on the secondary market, regardless of the insureds' financial information, and regardless of any inaccurate information submitted by PHL's agents, even glaringly obvious inaccuracies such as outlandish stories about sunken treasure.

61.    Largely due to Defendants' success in selling policies which they now deride as IOLI, PNX was able to pay significant dividends to its shareholders during the relevant timeframe.  Indeed, in each of the years from 2005-2007, it paid substantial dividends to its shareholders.

62.    Defendants' success in this market also enabled them to pay substantial bonuses to their executives and their sales force, and large commissions to their agents.  For example, Ed Humphrey testified that, due to the sale of policies which were likely to be sold into the secondary market, his compensation rose from $75,000 in 2004 to $1.8 million in 2006.  According to Mr. Humphrey, several other employees of Defendants received annual compensation in excess of $1 million during the relevant period due to the sale of policies likely to be sold into the secondary market.

63.    California is one of the states in which Defendants were most successful in their efforts to sell policies which they now condemn as IOLI.

Although most of Defendants' key employees fully embraced aggressive marketing and selling of policies that Defendants' now label as IOLI, one employee, Mr. Labar, complained to the California Insurance Commissioner about Defendants' practices.    The Insurance Commissioner correctly advised Mr. Labar that California's laws during the relevant period permitted so-called IOLI.  California law only required an insurable interest to exist at inception and policyholders were free to transfer their policies to investors after issuance.

64.    Defendants' participation in the secondary market for life insurance extended beyond actively promoting and soliciting life insurance policies which they knew were likely to be sold to third parties on the secondary market.  PNX became an active buyer and originator of policies on the secondary market.  On or about April 1, 2008, PNX issued a press release stating in relevant part:

> HARTFORD, Conn. – (BUSINESS Wire) – April 1, 2008 – The Phoenix Companies, Inc. (NYSE: PNX) today announced that through its subsidiary, Phoenix Life Solutions, it will enter the life insurance settlements business with a focus on customer value and full transparency on commissions and fees.
>
> Phoenix Life Solutions will work with four prominent brokerage general agencies (BGAs) across the country to originate life settlements, or purchase unwanted or unneeded life insurance policies from policy owners in exchange for an immediate cash settlement…

65.    Defendants even included a "right of first refusal" in their policies to facilitate Defendants buying their own policies on the secondary market. Defendants' assertions regarding "wagering," in the various rescission lawsuits they file, are hypocritical.  PNX itself has been a purchaser and originator of policies on the secondary market.  Defendants significantly and knowingly profited from the

23

secondary market during the years in which the sale of policies likely to be resold made up the core of Defendants' life insurance business.

**PHL Sells The Policies At Issue As Part Of Defendants' Plan To Profit From The Secondary Market**

66.    PHL issued Plaintiffs the Policies during the 2006-2008 time period.

67.    Each Policy insures the life of the individual insured who established the Trust to which the Policy was issued.  Each Policy complied with applicable insurable interest laws because the beneficiary of the Policy at issuance was an insurance trust established by the individual whose life was insured and, further, the beneficiary of the Trust owning Policy was a family member of the person whose life was insured by the Policy.

68.    Many of the insureds were residents of this judicial district and many of the Trusts originally had a trustee residing in this judicial district.  Many of the Policies were solicited by PHL (and Phoenix Life) agents residing in this judicial district.  The Trusts were and are the owners and beneficiaries of the Policies.  An index of the Policies at issue – including the Policy number and face amount –  is listed below:

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
| --- | --- | --- | --- |
| John Doe Trust 1 | 97520071 | 12/26/06 | $10 Million |
| Jane Doe Trust 2 | 97520888 | 3/1/07 | $18 Million |
| John Doe Trust 3 | 97522408 | 6/11/07 | $15 Million |
| Jane Doe Trust 4 | 97521696 | 4/25/07 | $10 Million |
| John Doe Trust 5 | 97520284 | 1/8/07 | $4 Million |
| John Doe Trust 6 | 97520812 | 3/9/07 | $3.8 Million |

24

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| Jane Doe Trust 7 | 97521031 | 3/26/07 | $10 Million |
| John Doe Trust 8 | 97521294 | 3/27/07 | $10 Million |
| John Doe Trust 9 | 97521048 | 8/20/06 | $10 Million |
| John Doe Trust 10 | 97521378 | 8/20/06 | $10 Million |
| John Doe Trust 11 | 97520506 | 1/30/07 | $8 Million |
| John Doe Trust 12 | 97522397 | 6/15/07 | $8 Million |
| John Doe Trust 13 | 97521320 | 3/28/07 | $8 Million |
| John Doe Trust 14 | 97521321 | 3/28/07 | $8 Million |
| John Doe Trust 15 | 97521809 | 5/3/07 | $7 Million |
| John Doe Trust 16 | 97521539 | 4/11/07 | $7 Million |
| John Doe Trust 17 | 97521403 | 4/11/07 | $10 Million |
| John Doe Trust 18 | 97521770 | 5/2/07 | $5 Million |
| John Doe Trust 19 | 97519179 | 2/6/07 | $5 Million |
| John Doe Trust 20 | 97521195 | 3/21/07 | $10 Million |
| John Doe Trust 21 | 97520861 | 3/1/07 | $7 Million |
| Jane Doe Trust 22 | 97521514 | 4/11/07 | $10 Million |
| John Doe Trust 23 | 97521012 | 3/14/07 | $10 Million |

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 24 | 97520777 | 4/19/07 | $5 Million |
| John Doe Trust 25 | 97521700 | 5/2/07 | $10 Million |
| John Doe Trust 26 | 97521172 | 3/21/07 | $7 Million |
| Jane Doe Trust 27 | 97525531 | 12/10/07 | $10 Million |
| John Doe Trust 28 | 97522142 | 6/20/07 | $2.5 Million |
| John Doe Trust 29 | 97524232 | 8/5/07 | $10 Million |
| John Doe Trust 30 | 97526378 | 2/5/08 | $3 Million |
| John Doe Trust 31 | 97522530 | 6/25/07 | $6 Million |
| John Doe Trust 32 | 97526094 | 12/11/07 | $10 Million |
| John Doe Trust 33 | 97523537 | 8/21/07 | $8.5 Million |
| John Doe Trust 34 | 97522647 | 7/19/07 | $11 Million |
| John Doe Trust 35 | 97522876 | 8/10/07 | $3 Million |
| John Doe Trust 36 | 97526077 | 1/25/08 | $4 Million |
| Jane Doe Trust 37 | 97523627 | 9/25/07 | $5 Million |
| John Doe Trust 38 | 97523991 | 9/6/07 | $6 Million |
| John Doe Trust 39 | 97526006 | 12/5/07 | $5 Million |
| Jane Doe Trust 40 | 97530500 | 5/16/08 | $7.25 Million |

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 41 | 97524710 | 10/26/07 | $10 Million |
| Jane Doe Trust 42 | 97522793 | 5/9/07 | $10 Million |
| Jane Doe Trust 43 | 97524804 | 10/20/07 | $12 Million |
| John Doe Trust 44 | 97524390 | 11/9/07 | $5 Million |
| John Doe Trust 45 | 97525135 | 11/27/07 | $7 Million |
| John Doe Trust 46 | 97526705 | 1/29/08 | $3 Million |
| Jane Doe Trust 47 | 97526661 | 1/24/08 | $6 Million |
| John Doe Trust 48 | 97524674 | 12/20/07 | $5 Million |
| John Doe Trust 49 | 97523945 | 9/13/07 | $10 Million |
| John Doe Trust 50 | 97524197 | 9/13/07 | $10 Million |
| John Doe Trust 51 | 97522969 | 8/12/07 | $4 Million |
| Jane Doe Trust 52 | 97524684 | 12/23/07 | $10 Million |
| Jane Doe Trust 53 | 97527013 | 12/23/07 | $10 Million |
| John Doe Trust 54 | 97523960 | 9/13/07 | $7.5 Million |
| John Doe Trust 55 | 97524122 | 9/13/07 | $7.5 Million |
| John Doe Trust 56 | 97523018 | 4/18/07 | $3.85 Million |
| Jane Doe Trust 57 | 97523622 | 8/24/07 | $9 Million |

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 58 | 97524002 | 10/11/07 | $3 Million |
| Jane Doe Trust 59 | 97523154 | 8/3/07 | $10 Million |
| John Doe Trust 60 | 97523517 | 8/22/07 | $7 Million |

69.   Many of the Plaintiff Trusts were established by individual insureds who reside in this judicial district.  As such, many of the Policies issued by PHL to the Trusts were issued on the lives of insureds residing in this judicial district. Specifically, the following Trusts were formed by insureds residing in this judicial district: Jane Doe Trust 2, John Doe Trust 8, John Doe Trust 9, John Doe Trust 10, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 18, John Doe Trust 20, John Doe Trust 21, John Doe Trust 23, John Doe Trust 26, John Doe Trust 29, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 39, and John Doe Trust 60.   And, PHL issued Policies to each of the Trusts listed above on the life of an individual residing in this judicial district.

70.   With respect to each of the Policies identified in paragraph 69 as having been issued on the lives of insureds residing in this judicial district, Plaintiffs are informed and believe, and upon such information and belief allege, that each insured signed the policy application and other related documents in this judicial district and were solicited by PHL to buy insurance within this judicial district.

71.   Many of the Trusts had a trustee who resided in this judicial district at the time that the Trust was formed, when the Trust applied for a Policy and when the Policy was issued.  Many of the Policies therefore were issued by PHL to Trusts whose trustee resided in this judicial district.   The following Trusts had a trustee residing in this judicial district when they were first formed and when the Policies

were applied for and issued by PHL: Jane Doe Trust 4, John Doe Trust 9, John Doe Trust 10, John Doe Trust 12, John Doe Trust 15, John Doe Trust 18, John Doe Trust 19, John Doe Trust 29, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 39, John Doe Trust 41, John Doe Trust 45, and John Doe Trust 60.

72.   With respect to each of the Policies identified in paragraph 71 as having been issued by PHL to Trusts whose trustee resided in this judicial district, Plaintiffs are informed and believe, and upon such information and belief allege, that the Trustee signed the insurance application and other related documents in this judicial district and were solicited by PHL to buy insurance within this judicial district.  Plaintiffs are further informed and believe, and upon such information and belief allege, that, for each of these Policies, PHL sent premium notices, annual policy summaries, illustrations and other documents to these Trusts, through their trustees, in this judicial district.

73.   Many of the Policies were solicited on PHL's behalf by PHL agents residing in this judicial district.  For example, PHL agent Kevin Burke, who resides in this judicial district, solicited the Policies issued to the following Trusts: Jane Doe Trust 2, Jane Doe Trust 4, John Doe Trust 8, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 18, John Doe Trust 20, John Doe Trust 21, John Doe Trust 23, John Doe Trust 25, John Doe Trust 26, John Doe Trust 29, and John Doe Trust 41.  PHL agent Richard Son, who resides in this judicial district, solicited the Policies issued to the following Trusts: John Doe Trust 32, John Doe Trust 38, and John Doe Trust 39.  PHL agent Rosslyn Muriu, who resides in this judicial district, solicited the Policies issued to the following Trusts: John Doe Trust 16, John Doe Trust 17, John Doe Trust 54, and John Doe Trust 55.

74.   For each of the Policies identified in paragraph 73, the PHL agent solicited and communicated with the relevant insureds and Trusts, on PHL's behalf, in or from this judicial district.  Additionally, PHL and Phoenix Life paid substantial

commissions to its agents residing in this judicial district as a result of the sale of the Policies.

75.     All of the Policies, including those discussed in paragraphs 69-74, have substantially similar policy language and were issued during the same time period as a part of Defendants' aggressive campaign to capture market share in the lucrative market for high face value policies likely to be sold into the secondary market.  As discussed throughout this Complaint, all of the Plaintiffs Trusts, including those discussed in paragraphs 69-72, have been targets of Defendants' fraudulent scheme to defraud policyholders and Defendants' wrongful actions towards and misrepresentations to Plaintiffs have all, as discussed herein, been nearly identical.

76.     Consistent with Defendants' marketing of their policies so as to take advantage of the burgeoning secondary market, the Policies issued by PHL provided Plaintiffs with significant transfer rights and flexibility.

77.     Each of the Policies expressly provided the policy owner with broad rights to change ownership of the policy, change the beneficiary of the policy, and assign rights under the policy.  With respect to sales of the policy (as opposed to a beneficial interest in the policy owner), PHL provided itself with a right of first refusal to purchase the policy as part of Defendants' own life settlement operations.

78.     Section 17 of the Policies provides, among other things, as follows:

> You may change the beneficiary by written notice filed with us at our main Administrative Office.  When we receive it, the change will take affect as of the date it was signed by you.  However, the change will be subject to any payments made or actions taken by us before we received the notice at our Main Administrative Office.

79.     Section 18 of the Policies provides, among other things, as follows:

> You may, by written notice, assign any interest in this policy without the consent of any person other than an

30

irrevocable Beneficiary…When filed, it will bind us as of the date of the assignment…

80.    After the Policies were issued, the beneficiaries of the Trusts transferred their beneficial interests in the Trusts, as was permitted by the Policies and applicable law.

81.    Wilmington Savings, as successor-in-interest to Christiana Bank, is the current trustee of each of the Trusts.  Christiana Bank was not the initial trustee of any of the Trusts.

82.    The Trusts have complied with all terms of the Policies, including the timely payment of all premiums due under the Policies.  To date, PHL has collected more than $44 million in premiums for the Policies, which has benefited all of the Defendants.

**Defendants Financially Collapse Due To Their Reckless Management**

83.    Since issuing the Policies, Defendants have found themselves in substantially different economic conditions as they suffered significant financial losses during the 2008-09 economic crisis.

84.    PNX suffered a reported net loss of approximately $726 million in 2008.  PNX reported an additional loss of $319 million in 2009, bringing to well over $1 billion its reported total losses in 2008-2009.  Plaintiffs are informed and believe, and upon such information and belief allege, that PNX's reported losses were primarily attributable to poor investment and management decision by Defendants' executives, as opposed to losses from the sale of life insurance products.

85.    As a result of these enormous losses, Defendants were downgraded by the ratings agencies to "junk" bond range and were forced to fire a substantial portion of their workforce.

86.    Defendants lost their biggest distributors in early 2009, because they were no longer able to sell Defendants' products due to the ratings downgrades.

This caused Defendants to exit the market for large face value life insurance policies.

87.   PNX's stock, which had traded at over $15 a share during much of 2007 plummeted to as low as 21 cents a share in 2009.

88.   Upon information and belief, the executives who were responsible for Defendants' collapse were rewarded with generous severance packages worth tens of millions of dollars.   This further weakened Defendants' tenuous financial position.

89.   Because Defendants are no longer attempting to sell large face value policies in the high net worth market, they apparently are no longer concerned with their reputation among distributors and consumers.   Instead, fighting for their own survival, Defendants have desperately avoided having to pay any large claims which would further weaken their final position.   The *Wall Street Journal* recently reported that Defendants now deny death claims (of all types) at a rate more than *seven* times higher than other life insurers.   As a result of these efforts, PNX only lost $12.6 million in 2010 and turned a modest profit in 2011.   Had Defendants honored their contractual obligations and paid death benefits when due, their financial slide undoubtedly would have continued.

### Defendants Begin Breaching Their Obligations To And Defrauding Their Policyholders In An Effort To Escape Their Dire Financial Situation

90.   In order to address their own financial troubles, Defendants have made a concerted effort to avoid having to honor policies PHL and Phoenix Life issued where either the policy or a beneficial interest in a trust owning the policy was later sold to investors on the secondary market.   Although PHL and Phoenix Life willingly issued such policies when it served Defendants' interests to increase premium revenue, Defendants now view such policies as unprofitable because the policies are not likely to lapse.   Upon information and belief, Defendants have concluded that if the policies PHL and Phoenix Life issued do not lapse, and

1   Defendants were to pay death benefits when due, Defendants' financial well-being
2   would be threatened and Defendants might become insolvent.  Defendants have
3   implemented a wide scale effort to avoid paying claims on the many billions of
4   dollars worth of policies they issued which have since been sold on the secondary
5   market and to defraud policyholders into continuing to pay premiums on these
6   policies Defendants have no intention of honoring, so that Defendants can later
7   attempt to confiscate these premiums and thus reap a financial windfall.

8       91.     As discussed below, PHL has acted unlawfully and in bad faith and
9   breached its contractual obligations to Plaintiffs as part of a fraudulent scheme with
10  the other Defendants.  Among other things, PHL has: (i) implemented a practice of
11  denying all claims, and instituting rescission actions, with respect to any policy
12  which has been transferred to an investor, or where the beneficial interest in the trust
13  that owns the policy has been transferred to an investor; (ii) unlawfully increased its
14  COI rates for the Policies and other policies which it believes were likely to have
15  been sold to investors; and (iii) attempted to restrict its policyholders' rights to
16  transfer their policies, in direct violation of the terms of their policies.  Defendants
17  have conspired to defraud Plaintiffs and other policyholders by engaging in a pattern
18  and practice of misrepresenting and fraudulently concealing their true intentions to
19  their policyholders, so that Plaintiffs and other policyholders will continue to pay
20  premiums on policies Defendants have no intention of honoring.

21      A.     **PHL Engages In A Systematic Practice Of Denying Death**
22             **Claims And Attempting To Rescind Policies And Keeping Its**
23             **Policyholders' Premiums**

24      92.     In an effort to address the financial problems of Defendants' own
25  making, over the past few years, PHL persistently has denied claims submitted
26  under policies similar to those at issue here.  Indeed, upon information and belief,
27  PHL has implemented a policy of denying claims under all policies like those at
28  issue here.

93.   PHL has implemented a practice in which it denies coverage where an investor has acquired an interest in the policy or in a trust which owns the policy. PHL has implemented this policy even though, as described above, PHL knowingly sold billions of dollars of policies it knew would be sold on the secondary market. PHL has denied claims under policies transferred to investors even though PHL specifically approved the transaction and recorded the policies' change of ownership without objection.

94.   The Policies provide that PHL will pay the death benefit due under the policy upon "due proof of death of the Insured." The Policies do not contain any further requirement that the policy owner must comply with to receive the death benefit after the insured's death.

95.   In violation of the Policies' express terms, PHL has instituted a practice in which it requires that, for any death claim submitted by a trust policyholder, the trust must complete a form providing information not required by the policy. This practice is admitted at Defendants' website. Under "Life Insurance Claims," the website has a section "What to Do if a Beneficiary is a Trust" stating: "In addition to the Beneficiary Statement of Benefits, a certified death certificate, original insurance contract and Certification and Acknowledgement of Trust Agreement are required." https://www.phoenixwm.phl.com/public/customerservice/claims.jsp.

96.   Although not required by the Policy's express terms, the Certification and Acknowledgement of Trust Agreement form demands that, in order to seek death benefits, a trust must state whether it has transferred any beneficial interest and, if so, to whom. Among the questions contained on the form are:

> Please identify all Trust Beneficiaries and any and all persons or entities with any right, title, or interest in the beneficial interest of the Trust and describe the relationship between the Insured and any person or entity named.

34

Has there been any change in Trust beneficiaries since the Date of Trust? If yes, please identify the changes.

Has any Trust Beneficiary sold, assigned, or otherwise transferred his/her interest in the Trust to anyone? If Yes, please identify the date of sale and the person or entity to which the interest was transferred.

Did any party other then the Insured fund any contributions to the Trust's capital/principal? If yes, please identify the source of all capital/principal contributions to the Trust.

97. If a trust does not provide PHL with all of the information requested on the Certification and Acknowledgement of Trust Agreement form, PHL denies the claim and refuses to pay benefits because, even though the policy does not require such information, the policyholder trust did not provide it. If the trust completes the form, and indicates that a beneficial interest transfer occurred, PHL denies the trust's claim because, although not prohibited by the policy or applicable law, a beneficial interest in the policyholder trust was transferred.

98. As evidence of this widespread and systematic practice by PHL to deny claims when a policy or beneficial interest in a trust owning a policy has been sold on the secondary market: (i) PHL has filed numerous lawsuits seeking to rescind policies and deny death claims; and (ii) several lawsuits have been filed against PHL seeking to enforce policies and recover death claims. PHL also has filed numerous lawsuits in which, prior to the insured's death, it has sought to rescind the applicable policy based on the fact that the policy or the beneficial interest in the trust policy owner was transferred. PHL even seeks to deny claims and rescind policies after collecting premiums for five or six years. In these various lawsuits, PHL has claimed that the fact that the beneficial interest in the trust, or the policy itself, has

35

been transferred means that the policy lacks a valid insurable interest. By way of example, a partial list of lawsuits includes: *PHL Variable Insurance Company v. U.S. Bank Nat'l Ass'n, et al.*, Case No. 10-cv-00197 (D. Minn. Apr. 8, 2010), Complaint; *PHL Variable Insurance Company v. 2008 Christa Joseph Irrevocable Trust*, Case No. 10-cv-03001 (D. Minn. Jul. 14, 2010), Complaint; *PHL Variable Insurance Company v. Jay Doss Irrevocable Life Insurance Trust*, Case No. HHD-CV-10-6017099-S (Conn. Superior Court, Hartford, November 23, 2010), Complaint; *PHL Variable Insurance Company v. Dolores C. Painter Irrevocable NJ Trust, et al.*, Case No. 10-cv-03603 (D.N.J. Jul. 16, 2010), Complaint; *PHL Variable Insurance Company v. LaSalle Bank N.A., et al*, Case No. 08-cv-11562 (E.D. Mich. Apr. 11, 2008), Complaint; *PHL Variable Insurance Company v. Clifton Wright Family Insurance Trust*, Case No. 09-C-2344 (S.D. Cal. Nov. 12, 2009), Complaint; *PHL Variable Insurance Company v. Kenneth Green Family Insurance Trust*, Case No. 09-cv-02606 (S.D. Cal. Nov. 18, 2009), Complaint; *PHL Variable Insurance Company v. The James Evans Family Insurance Trust*, Case No. 10-cv-00240 (S.D. Cal. Jan. 29, 2010), Complaint; *PHL Variable Insurance Company v. The Abrams Family Irrevocable Life Insurance Trust*, Case No. 10-CV-521 (S.D. Cal. March 11, 2010); *PHL Variable Insurance Company v. Kristian Giordano, et al.*, Case No. 10-cv-00661 (S.D. Cal. Mar. 26, 2010), Complaint; *PHL Variable Insurance Company v. Gabriel Giordano, et al.*, Case No. 10-cv-0071 (S.D. Cal. Apr. 13, 2010), Complaint; *PHL Variable Insurance Company v. The Hyman Davidson 2008 Irrevocable Life Insurance Trust*, Case No. 10-CV-1219 (S.D. Cal. June 8, 2010); Complaint; *PHL Variable Insurance Company v. The Patricia Sanford Family Insurance Trust, et al.*, Case No. 10-cv-00784 (S.D. Cal. Apr. 14, 2010), Complaint; *PHL Variable Insurance Company v. Alberto Rubio Family Insurance Trust, et al.*, Case No. 09-CV-4652 (C.D. Cal. June 26, 2009), Complaint; *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-0347, (C.D. Cal. Apr. 6, 2012); *U.S. Bank National Association v.*

*PHL Variable Insurance Company*, Case No. 12-CV-00877, (D. Minn. Apr. 6, 2012).

99.   As a result of this widespread and systematic practice by Defendants, thirteen PHL policyholders recently brought claims against PHL for breach of contract, fraud, and declaratory relief related to the validity of their policies. *See* Counterclaims in *PHL Variable Insurance Company v. ESF QIF Trust*, Case No. 12-CV-00319, (D. Del. Mar. 15, 2012) [D.I. 8].

100.   PHL's intention to not honor the Policies also is evident from other actions by PHL.  For example, PHL has challenged the validity of five large face amount policies owned by trusts for which Wilmington Savings, as successor-in-interest to Christiana Bank, serves as trustee, including three of the Policies. *See PHL Variable Insurance Company v. Price Dawe 2006 Insurance Trust*, Case No. 10-CV-964, (D. Del. Nov. 12, 2010), Complaint; *PHL Variable Insurance Company v. The Helene Small Insurance Trust*, Case No. 12-CV-00312, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Edwin Fuld Life Insurance Trust*, Case No. 12-CV-00313, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Chong Son Pak Life Insurance Trust*, Case No. 12-CV-00314, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Virginia L. Lankow Life Insurance Trust*, Case No. 12-CV-315, (D. Del. Mar. 15, 2012), Complaint.  PHL uses template "cookie cutter" complaints alleging that the policies are "IOLI" and violate applicable insurable interest laws.

101.   PHL also has denied claims and/or brought rescission actions regarding several policies in which PHL's agent Robert Fink, who was PHL's agent for many of the Policies, was the agent. *See, e.g., PHL Variable Insurance Company v. The Edwin Fuld Life Insurance Trust*, Case No. 12-CV-00313, (D. Del. Mar. 15, 2012); *PHL Variable Insurance Company v. The Virginia L. Lankow Life Insurance Trust*, Case No. 12-CV-315, (D. Del. Mar. 15, 2012). Further, on information and belief, PHL has long considered Kevin Burke, who was PHL's agent for approximately 15

of the Policies, a so-called IOLI producer whose policies it intends to challenge. Indeed, during a 2010 deposition of Mr. Labar, Mr. Labar singled out Mr. Burke as one of the PHL and Phoenix Life agents who produced the largest volume of what Defendants now condemn as IOLI.

102.  Additionally, PHL maintains tracking spreadsheets of policies it considers IOLI.  Upon information and belief, each of the Policies at issue have long been included on PHL's IOLI tracking spreadsheets, indicating that PHL will ultimately deny any claim submitted under the Policies.

103.  Moreover, when attempting to rescind policies, PHL, as a matter of practice, has taken the position that it not only is entitled to deny claims and rescind coverage, but also that PHL is entitled to retain all premiums paid for the policies. By taking that position, PHL is directly breaching the terms of its policies.

104.  Section 21 of the Policies expressly provides: "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

105.  In other words, PHL contractually agreed, as an inducement to buying policies, that if it successfully contested a policy it would pay the policyholder back no less than all premiums paid for the policy.  PHL's consistent failure to honor the terms of its policies is willful and done in bad faith.

106.  Through its pattern of denying claims, challenging policies, and attempting to retain premiums, on similarly-situated policies, PHL has caused the Plaintiffs harm by significantly diminishing the value of their Policies

107.  The marketability of the Policies owned by Plaintiffs depends on investors' confidence that the issuing insurer will pay a claim upon the death of the insured.  In the absence of certainty that the carrier will honor the Policy, the Policy is rendered unmarketable and Plaintiffs are deprived of the economic benefit of

owning the Policies.

108.   PHL's systematic refusal to pay death benefits contractually due under policies similar to these Policies, and its stance that it can retain premiums paid under the Policies, have destroyed the market's confidence in the Policies and significantly diminished the value of the Policies, thus depriving Plaintiffs of their economic interests in the Policies.  As a result of PHL's continuous and systematic challenge of such policies and the uncertainty it has engendered, the value and marketability of the Policies has been and will continue to be impaired.  In addition, PHL continues to collect premiums on the Policies at the same time that it is claiming that it owes no benefits on similarly situated policies.

109.   Based on Defendants actions described above, the market has no confidence that: (i) PHL will honor any policy which has been transferred or any policy owned by a trust whose beneficial interest has been transferred; and (ii) PHL will willingly return premiums if a policy is rescinded.  Plaintiffs have thus been forced into a position where they must continue paying premiums without any assurance their Policies will be honored by PHL or even that their premiums will be returned if PHL does not honor the Policies.

110.   As one Judge aptly described the present harm caused by PHL's parent, Phoenix Life's, similar pattern of challenging policies:

> The marketability of the plaintiff's property, the subject life insurance policy, has been destroyed by [Phoenix Life's] refusal to honor similar policies involving [an agent] or that involve an alleged stranger-originated policy scheme with a trust structure similar to that used herein. As interest in a life insurance policy is a recognized property right, Phoenix's prior actions and express statements regarding trust schemes involving [an agent] create a cloud over the marketability of the subject policy.

1
2
3
4
5
6
7

> The likelihood that Phoenix will contest the policy upon the insured's death substantially diminishes the value of the policy, if it does not destroy it completely.  July 5, 2001 Order in *CSSEL Bare Trust, Dated As Of April 21, 2006 v. Phoenix Life Insurance Company*, Index No. 601002/2009, Supreme Court of the State of New York, New York County.

8   111.  Plaintiffs believe that their Policies are valid and are continuing to pay substantial premiums to PHL for such Policies.  PHL's actions make clear not only that it will ultimately challenge the Policies but also that it will attempt to confiscate the premiums Plaintiffs are paying and will continue to pay.  To redress a real and present economic injury to them, Plaintiffs are entitled to a declaratory judgment by this Court establishing PHL's obligation to pay an eventual claim for death benefits under the Policies or, in the alternative, to require PHL to refund all premiums on any policy that is rescinded or voided.

**B.      PHL, As Part Of A Conspiracy With Phoenix Life And PNX, Fraudulently   Misrepresents   And   Conceals   Its   True Intentions So As To Obtain Additional Revenue**

112.  Having determined that it will not honor the Policies and will deny death claims submitted under the Policies, and other similar policies, PHL has implemented a widespread practice of defrauding Plaintiffs and other policyholders into paying additional premiums which PHL will later attempt to confiscate.  PHL has concealed from Plaintiffs and other policyholders PHL's intention to ultimately deny their claims for benefits.  PHL's failure to disclose its intention to deny Plaintiffs' and other policyholders' claims for benefits when submitted is material because, among other things, PHL has continued to bill Plaintiffs and other policyholders for premiums and to send them other communications intended to assure Plaintiffs and other policyholders that their policies are valid and in good

standing, lull them into believing that PHL intends to pay death benefits when due and induce them to continue to pay PHL premiums.  PHL's communications both affirmatively misrepresent and fraudulently conceal PHL's true intentions, which are to ultimately deny Plaintiffs' claims for coverage and seek to retain the premiums that PHL continues to bill and receive.

113.   PHL has engaged in this widespread fraud in concert with, and as part of a conspiracy with, Phoenix Life and PNX in an effort to improve Defendants' dire financial situation.  Plaintiffs are informed and believe that Defendants have several improper motivations for this dishonest and fraudulent conduct.  First, Plaintiffs are informed and believe that Defendants hope that, by concealing their true intentions while PHL continues to charge and receive premiums, Plaintiffs will allow some of the Policies to lapse due to PHL's other improper conduct with respect to the Policies.  Every Policy that lapses would give Defendants a windfall and allow them to avoid the cost of litigation.  Further, as described above, when PHL denies coverage and attempts to rescind policies, it takes the position that it is entitled to retain premiums.  Thus, by continuing to charge premiums on policies it has no intention of honoring, PHL increases the amount of premiums it can later attempt to confiscate when it ultimately denies coverage and attempts to rescind.  As part of this conspiracy among Defendants, PHL has collected millions of dollars in premiums under false pretenses, with no intention of either honoring the Policies or returning the premiums.

114.   One egregious example of this fraudulent practice by Defendants relates to the Policy owned by the John Doe Trust 1.  On December 11, 2009 PHL filed a federal lawsuit in Florida accusing the insured who created the John Doe Trust 1 of lying on an insurance application for a different policy and alleged that policy was an unlawful IOLI policy.  PHL's agent for the policy, Robert Fink, was later added as a third-party defendant in that case.  PHL, however, delayed and continued collecting premiums for an additional two years before suing to rescind

41

the Policy owned by the John Doe Trust 1 on the very same grounds it previously sought to rescind another policy issued on the life of the same insured and solicited by the same agent.

115.  PHL's practice of failing to disclose and concealing the intent to deny benefits, challenge the policies and attempt to keep the premiums it continues to bill and collect was adopted by Defendants in bad faith and is a fraud on Plaintiffs and other policyholders.   In furtherance of this fraudulent scheme, PHL has made repeated misrepresentations and concealed material information with a fraudulent intent.

116.  For each of the Policies, PHL has continued to send premium notices by the United States Postal Service, charging premiums to Plaintiffs that they must pay to avoid having their Policies lapse.  Defendants have caused PHL to mail Plaintiffs these notices, and collect the premiums billed therein, without disclosing to Plaintiffs that Defendants secretly intend to have PHL deny benefits when claims are made and seek to retain all of the premiums being billed and collected.  PHL has also provided Defendants with wiring instructions for the payment of premiums and accepted the premium payments by interstate wire transfer.  PHL mailed the notices as part of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which it does not intend to return.

117.  Premiums are only due under policies which are valid and enforceable. If an insurer knows or believes that a policy is invalid or unenforceable, the insurer has an obligation to inform the policyholder of that fact and cease charging premiums for the policy in question.  PHL has determined that it will not honor the Policies, yet has continued to use the United States Postal Service to bill Plaintiffs for premiums PHL claims are due under the Policies.  Each time PHL mails a premium notice to Plaintiffs, PHL is affirmatively representing that, to its knowledge, the Policy in question is valid and enforceable and that it has no plan to

challenge the Policy or deny benefits under the Policy.  Each time that PHL has used the United States Postal Service to bill Plaintiffs for premiums, PHL has fraudulently concealed its intention to deny benefits under the Policy when the insured dies and attempt to rescind the Policy and confiscate all of the premiums being billed and collected.

118.  For each Policy, PHL has used the United States Postal Service to mail Plaintiffs annual statements (called an "Annual Policy Summary") advising Plaintiffs of their Policies' current death benefits and policy values.  Each Annual Policy Summary thanks the Plaintiff to whom it is mailed "for choosing Phoenix to meet your insurance and investment needs."  Each Annual Policy Summary also states that "Phoenix is committed to providing you with the highest level of service now, and in the future."  Each Annual Policy Summary further states that the Plaintiff policyholder "should consider requesting more detailed information about your policy to understand how it may perform in the future."  Plaintiffs are informed and believe, and upon such information and belief allege, that PHL mailed these statements with the intent to ultimately deny Plaintiffs' claims for benefits.  PHL mailed Plaintiffs these Annual Policy Summaries in furtherance of Defendants' scheme to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and earn additional premium revenue which PHL intends to keep.

119.  The Annual Policy Summaries affirmatively misrepresented and fraudulently concealed facts from Plaintiffs.  When PHL represented to Plaintiffs the amount of the current death benefit and policy value, PHL knew and intended that Plaintiffs would believe that PHL intended to honor the Policy and pay the amounts stated and that the Plaintiffs would be induced to continue to pay premiums based on those representations and assurances.  These Annual Policy Summaries mailed to Plaintiffs each falsely represented that PHL considered the Policy in question valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy.   In mailing this information to Plaintiffs, PHL fraudulently

concealed that it had no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

120.   As invited to do by the Annual Policy Summaries, Plaintiffs requested policy illustrations from PHL.  PHL responded to Plaintiffs' requests by either faxing Plaintiffs policy illustrations by interstate wires or mailing Plaintiffs the policy illustrations by the United States Postal Service.  Among other things, the policy illustrations faxed or mailed to Plaintiffs advised Plaintiffs of the current death benefits and policy values for their respective Policies.  The policy illustrations also contained projections of these figures based on premium outlays. When PHL faxed and mailed these illustrations to Plaintiffs, PHL did not disclose to Plaintiffs that PHL did not intend to honor the Policies and pay benefits.  PHL faxed and mailed Plaintiffs the illustrations in furtherance of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which PHL does not intend to return.

121.   The policy illustrations faxed and mailed to Plaintiffs by PHL affirmatively misrepresented and fraudulently concealed material facts.   For example, when PHL represented to a Plaintiff the amount of the Policy's current death benefit and policy value, PHL knew and intended that the Plaintiff would: (i) believe that PHL intended to honor the Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums.   The policy illustrations faxed and mailed to each Plaintiff by PHL falsely represented that PHL considered the Policy to be valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits.  PHL fraudulently concealed, and failed to disclose, that it did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

122.   PHL also has sent each Plaintiff documents entitled Verification of Coverage for Life Insurance Policy ("VOC") either by fax using interstate wires or

mail using the United States Postal Service. The VOCs verified to Plaintiffs that they had coverage from PHL and gave details about the coverage. For example, in response to the VOC's question "Is the above referenced policy in force," PHL answered and represented "YES." The VOCs confirmed for each Plaintiff the current death benefit and policy value for that Plaintiff's Policy. The VOCs faxed and mailed to each Plaintiff fraudulently concealed, and failed to disclose, that PHL did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid. PHL faxed and mailed Plaintiffs the VOCs in furtherance of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which PHL does not intend to return.

123. The VOCs that PHL faxed and mailed Plaintiffs affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented "YES" in response to the question whether a Policy was "in force," PHL knew and intended that Plaintiffs would: (i) believe that PHL intended to honor their respective Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. When PHL represented to Plaintiffs the current death benefit and policy value for their respective Policies, PHL knew and intended that Plaintiffs would: (i) believe that PHL intended to honor their respective Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. Each VOC that PHL faxed or mailed to a Plaintiff falsely represented that PHL considered the Policy "in force," valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In providing this information to Plaintiffs, PHL fraudulently concealed, and failed to disclose, that it had no intention of paying the amounts stated and intended to deny any claim for benefits and confiscate all premiums paid.

124. As described above, many of the Policies were solicited by PHL agents

1  residing in this judicial district.  For the Policies noted in paragraph 73 above, the
2  illustrations mailed or faxed to Plaintiffs by PHL each represented that they were
3  prepared by the applicable agent residing in this judicial district.  For example, (a)
4  the illustrations mailed or faxed by PHL to the Jane Doe Trust 4 represent that they
5  were "Prepared by: KEVIN BURKE"; (b) the illustrations mailed or faxed by PHL
6  to the John Doe Trust 32 represent that they were "Prepared by: RICHARD SON";
7  and (c) the illustrations mailed or faxed by PHL to the John Doe Trust 55 represent
8  that they were "Prepared by: ROSSYLN MURIU".   The premium notices mailed to
9  the Trusts noted in paragraph 73 above also refer to the applicable agent residing in
10  this judicial district.

11      125.  Plaintiffs are informed and believe, and on such information and belief
12  allege, that PHL and Phoenix Life continue to pay renewal commissions to the
13  agents residing in this judicial district as new premiums are paid on these Policies.
14  Thus, both PHL and its agents residing in this district are benefiting and profiting
15  from Defendants' fraud.

16      126.  Set forth below are representative examples of communications faxed
17  or mailed to Plaintiffs by PHL as part of Defendants' plan to fraudulently induce
18  Plaintiffs and other policyholders to continue to pay premiums on policies that
19  Defendants secretly intend will not be honored by PHL when death benefits become
20  due.  Each of these communications affirmatively misrepresented and fraudulently
21  concealed material facts from Plaintiffs:

22      •  PHL sent fraudulent communications to the John Doe Trust 1, through its
23  trustee, including but not limited to, communications dated as follows: premium
24  notices of December 6, 2009, December 6, 2010, and December 6, 2011; annual
25  policy summaries of December 29, 2009, December 28, 2010, and December 27,
26  2011; policy illustrations of February 9, 2009, November 16, 2009, December 28,
27  2009, January 10, 2011, and February 8, 2012; and VOC of September 21, 2011.

28      •  PHL sent fraudulent communications to the Jane Doe Trust 2, through its

trustee, including but not limited to, communications dated as follows: premium notices of February 10, 2009, February 10, 2010 and February 10, 2011; annual policy summaries of March 3, 2009, March 2, 2010 and March 1, 2011; policy illustrations of November 18, 2009, March 3, 2010 and March 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 3, through its trustee, including but not limited to, communications dated as follows: premium notice of May 22, 2010; annual policy summaries of June 11, 2009 and June 11, 2010; policy illustrations of November 16, 2009, June 17, 2010, June 16, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 4, through its trustee, including but not limited to, communications dated as follows: premium notices of April 6, 2010, April 6, 2011 and April 6, 2012; annual policy summaries of April 28, 2009, April 27, 2010, April 26, 2011, and April 26, 2012; policy illustrations of November 16, 2009, April 30, 2010, May 4, 2011, January 17, 2012, and May 9, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 5, through its trustee, including but not limited to, communications dated as follows: premium notices of December 19, 2009, December 19, 2010, and December 19, 2011; annual policy summaries of January 8, 2009, January 9, 2010, January 11, 2011, and January 10, 2012; policy illustrations of November 23, 2009, January 20, 2010, January 18, 2011, November 23, 2011, and February 19, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 6, through its trustee, including but not limited to, communications dated as follows: premium notices of February 18, 2010, February 18, 2011, and February 18, 2012; annual policy summaries of November 24, 2009, April 9, 2010, April 9, 2011, and March 9, 2012; policy illustrations of November 23, 2009, March 16, 2010, March 14, 2011, and April 9, 2012; and VOC of September 21, 2011.

47

- PHL sent fraudulent communications to the Jane Doe Trust 7, through its trustee, including but not limited to, communications dated as follows: premium notices of March 6, 2009, March 6, 2010, March 6, 2011, and March 6, 2012; annual policy summaries of March 26, 2009, March 26, 2010, March 28, 2011, and March 26, 2012; policy illustrations of December 1, 2009, April 6, 2010, March 31, 2011, January 4, 2012, and March 27, 2012; and VOC of September 20, 2011.

- PHL sent fraudulent communications to the John Doe Trust 8, through its trustee, including but not limited to, communications dated as follows: premium notices of March 7, 2009, March 7, 2010, March 7, 2011, and March 7, 2012; annual policy summaries of March 27, 2009, March 30, 2010, March 28, 2011, and March 27, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 19, 2011.

- PHL sent fraudulent communications to the John Doe Trust 9, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2009, July 31, 2010, and July 31, 2011; annual policy summaries of August 26, 2009, August 21, 2010, and August 22, 2011; policy illustrations of August 26, 2009, September 10, 2010, August 29, 2011, and January, 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 10, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2010 and July 31, 2011; annual policy summaries of August 20, 2009, August 21, 2010, and August 22, 2011; policy illustrations of September 20, 2010, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 11, through its trustee, including but not limited to, communications dated as follows: premium notices of January 10, 2010, January 10, 2011, and January 10, 2012; annual policy summaries of November 24, 2009, February 2, 2010, February 1, 2011, and January, 2012; policy illustrations of February 23, 2009, February 2, 2010, February 17,

48

2011, November 10, 2011, and January 5, 2012; and VOC of September 22, 2011.

• PHL sent fraudulent communications to the John Doe Trust 12, through its trustee, including but not limited to, communications dated as follows: premium notice of May 26, 2010; annual policy summaries of June 16, 2010 and June 16, 2011; policy illustrations of December 22, 2009, June 23, 2010, June 23, 2011, and February 19, 2012; and VOC of June 13, 2011.

• PHL sent fraudulent communications to the John Doe Trust 13, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 22, 2009, April 5, 2010, March 31, 2011, January 4, 2012, and April 5, 2012; and VOC of September 22, 2011.

• PHL sent fraudulent communications to the John Doe Trust 14, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 22, 2011.

• PHL sent fraudulent communications to the John Doe Trust 15, through its trustee, including but not limited to, communications dated as follows: premium notices of April 13, 2010 and April 13, 2011; annual policy summaries of May 4, 2010 and May 3, 2012; policy illustrations of December 14, 2009, May 4, 2010, May 19, 2011, and January 17, 2012; and VOC of November 9, 2011.

• PHL sent fraudulent communications to the John Doe Trust 16, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of September 29, 2009, May 6, 2010, May 18, 2011, January 17,

49

2012, and May 8, 2012; and VOC of September 22, 2011.

• PHL sent fraudulent communications to the John Doe Trust 17, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 14, 2009, April 19, 2010, April 14, 2011, January 17, 2012 and May 8, 2012; and VOC of September 22, 2011.

• PHL sent fraudulent communications to the John Doe Trust 18, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of December 11, 2009, May 4, 2010, August 1, 2011, and May 8, 2012; policy illustrations of December 10, 2009, May 4, 2010, January 7, 2012, and May 4, 2012; and VOCs of November 17, 2011 and December 5, 2011.

• PHL sent fraudulent communications to the John Doe Trust 19, through its trustee, including but not limited to, communications dated as follows: premium notices of January 17, 2010, January 17, 2011, and January 17, 2012; annual policy summaries of February 6, 2009, February 9, 2010,  February 7, 2011, and February 6, 2012; policy illustrations of May 13, 2009, November 30, 2009, February 12, 2010, February 9, 2011, January 4, 2012, and February 8, 2012; and VOC of September 21, 2011.

• PHL sent fraudulent communications to the John Doe Trust 20, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2009, March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, April 14, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 14, 2009, March 23, 2010, April 27, 2011, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

• PHL sent fraudulent communications to the John Doe Trust 21, through its trustee, including but not limited to, communications dated as follows: premium

notices of February 10, 2009, February 10, 2010, February 10, 2011, and February 10, 2012; annual policy summaries of March 3, 2009, March 2, 2010, March 1, 2011, and March 1, 2012; policy illustrations of November 30, 2009, March 17, 2010, March 14, 2011, January 4, 2012, and March 8, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 22, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of November 10, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 10, 2009, April 19, 2010, January 17, 2012 and April 13, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 23, through its trustee, including but not limited to, communications dated as follows: premium notices of February 23, 2009, February 23, 2010, February 23, 2011, and February 23, 2012; annual policy summaries of March 17, 2009, March 16, 2010, March 15, 2011, and March 16, 2012; policy illustrations of December 10, 2009, March 16, 2010, March 18, 2011, January 14, 2012 and March 19, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 24, through its trustee, including but not limited to, communications dated as follows: premium notices of March 30, 2010, March 30, 2011, and March 30, 2012; annual policy summaries of April 20, 2009, April 20, 2010, April 20, 2011, and April 19, 2012; policy illustrations of December 10, 2009, April 20, 2010, April 27, 2011, and May 9, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 25, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2009, April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of May 5, 2009, May 4, 2010, and May 8, 2012; policy

51

illustrations of December 10, 2009, May 4, 2010, January 17, 2012 and May 4, 2012; and VOC of November 9, 2011.

- PHL sent fraudulent communications to the John Doe Trust 26, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, March 22, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 1, 2009, March 23, 2010, March 23, 2010, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 27, through its trustee, including but not limited to, communications dated as follows: premium notice of November 20, 2010; annual policy summaries of December 10, 2009, December 11, 2009, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011 and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 28, through its trustee, including but not limited to, communications dated as follows: premium notice of May 31, 2008; annual policy summaries of June 23, 2009, September 28, 2010, and June 20, 2011; policy illustrations of December 29, 2009, June 23, 2010, June 27, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 29, through its trustee, including but not limited to, communications dated as follows: premium notices of July 16, 2010 and July 16, 2011; annual policy summaries of August 5, 2010 and August 5, 2011; policy illustrations of December 15, 2009, September 1, 2010, August 15, 2011 and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 30, through its trustee, including but not limited to, communications dated as follows: premium notices of January 16, 2011 and January 16, 2012; annual policy summaries of February 5, 2010, February 7, 2011, and February 6, 2012; policy illustrations of

March 2, 1010, February 16, 2011, January 4, 2012 and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 31, through its trustee, including but not limited to, communications dated as follows: premium notice of June 5, 2010; annual policy summaries of June 26, 2010 and June 28, 2011; policy illustrations of December 14, 2009, June 28, 2010, July 12, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 32, through its trustee, including but not limited to, communications dated as follows: premium notices of November 21, 2010 and November 21, 2011; annual policy summaries of December 11, 2009, December 14, 2010, and December 13, 2011; policy illustrations of March 4, 2010, December 21, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 33, through its trustee, including but not limited to, communications dated as follows: premium notices of August 1, 2010 and August 1, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 15, 2009, August 24, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 34, through its trustee, including but not limited to, communications dated as follows: premium notices of June 29, 2009 and June 29, 2010; annual policy summaries of July 19, 2010 and July 19, 2011; policy illustrations of December 15, 2009, July 22, 2010, July 20, 2011 and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 35, through its trustee, including but not limited to, communications dated as follows: premium notices of July 21, 2009, July 21, 2010, and July 21, 2011; annual policy summaries of August 11, 2009 and August 10, 2010; policy illustrations of December 15, 2009, September 10, 2010, August 11, 2011, August 15, 2011 and January 19, 2012; and

VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 36, through its trustee, including but not limited to, communications dated as follows: premium notices of January 5, 2011 and January 5, 2012; annual policy summaries of January 26, 2010, January 25, 2011, and January 25, 2012; policy illustrations of March 2, 2010, February 9, 2011, November 29, 2011, and January 31, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 37, through its trustee, including but not limited to, communications dated as follows: premium notices of September 5, 2009, September 5, 2010, and September 5, 2011; annual policy summaries of September 26, 2009, September 28, 2010, and September 30, 2011; policy illustrations of December 22, 2009, March 30, 2010, August 29, 2011, September 29, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 38, through its trustee, including but not limited to, communications dated as follows: premium notice of August 17, 2011; annual policy summaries of September 8, 2010 and September 7, 2011; policy illustrations of December 22, 2009, October 5, 2010, August 9, 2011, August 22, 2011, September 12, 2011, and January 24, 2012; and VOCs of June 13, 2011 and July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 39, through its trustee, including but not limited to, communications dated as follows: premium notices of November 15, 2010 and November 15, 2011; annual policy summaries of December 8, 2009, December 7, 2010, and December 5, 2011; policy illustrations of December 22, 2009, December 5, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 40, through its trustee, including but not limited to, communications dated as follows: premium notices of April 26, 2011 and April 26, 2012; annual policy summary of June 3,

54

2010; policy illustrations of June 3, 2010, May 20, 2011, and January 17, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 41, through its trustee, including but not limited to, communications dated as follows: premium notice of October 6, 2010; annual policy summaries of October 27, 2009, October 26, 2010, and October 26, 2011; policy illustrations of January 5, 2010, November 3, 2010, November 1, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 42, through its trustee, including but not limited to, communications dated as follows: premium notices of April 19, 2010, April 19, 2011 and April 19, 2012; annual policy summaries of May 11, 2010 and May 9, 2012; policy illustrations of December 14, 2009, May 11, 2010, May 19, 2011, January 17, 2011, and May 16, 2012.

- PHL sent fraudulent communications to the Jane Doe Trust 43, through its trustee, including but not limited to, communications dated as follows: premium notices of September 30, 2009, September 30, 2010, and September 30, 2011; annual policy summaries of October 20, 2009, October 20, 2010, and October 20, 2011; policy illustrations of January 2, 2010, November 3, 2010, November 16, 2011, December 19, 2011, and March 1, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 44, through its trustee, including but not limited to, communications dated as follows: premium notices of October 20, 2010 and October 20, 2011; annual policy summaries of November 10, 2009, November 9, 2010, and November 9, 2011; policy illustrations of January 5, 2010, November 16, 2010, November 17, 2011, and February 6, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 45, through its trustee, including but not limited to, communications dated as follows:  premium notices of November 7, 2010 and November 7, 2011; annual policy summaries of November 27, 2009, November 30, 2010, and December 2, 2011;  policy

illustrations of December 15, 2009, December 1, 2010, November 30, 2011, and February 8, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 46, through its trustee, including but not limited to, communications dated as follows:  premium notices of January 9, 2011 and January 9, 2012; annual policy summaries of January 29, 2010, February 1, 2011, and February 1, 2012; policy illustrations of March 2, 2010, February 1, 2011, November 29, 2011, and February 1, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 47, through its trustee, including but not limited to, communications dated as follows: premium notices of January 4, 2009 and January 4, 2012; annual policy summaries of January 26, 2010, January 27, 2011, and January 24, 2012; policy illustrations of March 2, 2010, January 27, 2011, November 29, 2011, January 25, 2012, and January 31, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 48, through its trustee, including but not limited to, communications dated as follows: premium notices of November 20, 2010 and November 20, 2011; annual policy summaries of December 10, 2009, December 11, 2010, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 49, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 17, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 50, through its trustee, including but not limited to, communications dated as follows: premium

56

notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, September 13, 2011; and policy illustrations of December 17, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 51, through its trustee, including but not limited to, communications dated as follows: premium notices of July 23, 2009, July 23, 2010, and July 23, 2011; annual policy summaries of August 12, 2009, August 12, 2010, and August 17, 2011; policy illustrations of November 16, 2009, September 10, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 52, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, January 6, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 53, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, December 29, 2010, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 54, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 15, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, January 24, 2011, and March 1, 2011; and VOC of July 14,

2011.

- PHL sent fraudulent communications to the John Doe Trust 55, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 56, through its trustee, including but not limited to, communications dated as follows: premium notices of March 19, 2009, March 19, 2010, March 19, 2011, and March 19, 2012; annual policy summaries of April 8, 2009, April 8, 2010, April 8, 2011, and April 9, 2012; policy illustrations of June 9, 2009, December 10, 2009, April 19, 2010, and January 17, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 57, through its trustee, including but not limited to, communications dated as follows: premium notices of August 4, 2010 and August 4, 2011; annual policy summaries of August 24, 2010 and August 24, 2011; policy illustrations of December 17, 2009, August 27, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 58, through its trustee, including but not limited to, communications dated as follows: premium notices of September 21, 2009, September 21, 2010, and September 21, 2011; annual policy summaries of October 13, 2009, October 12, 2010, and October 11, 2011; policy illustrations of January 5, 2010, October 12, 2010, October 31, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 59, through its trustee, including but not limited to, communications dated as follows: premium notices of July 14, 2009, July 14, 2010, and July 14, 2011; annual policy summaries of October 13, 2009, August 3, 2010, and August 3, 2011; policy illustrations of

October 13, 2009, August 12, 2010, August 8, 2011, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

- • PHL sent fraudulent communications to the John Doe Trust 60, through its trustee, including but not limited to, communications dated as follows: premium notices of August 2, 2010 and August 2, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 17, 2009, August 24, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

127. In furtherance of Defendants' fraudulent scheme, PHL (specifically, Phoenix Life representatives acting on behalf of PHL), faxed or mailed each Plaintiff a document entitled "Policy Audit Request for Life Insurance Policy" ("Policy Audit") which again misrepresented and concealed material facts about each Plaintiff's Policy.

128. On or about January 5, 2012, Wilmington Savings, as successor in interest to Christiana Bank in its capacity as trustee for Plaintiffs, provided PHL/Phoenix Life with a "schedule of policies" and asked that a "Policy Audit request form" be completed to update the records for the Policies. The letter requested that PHL/Phoenix Life provide this information to Pricewaterhouse Coopers LLP and the trustee.

129. In response to the trustee's request, PHL (by Phoenix Life) sent a Policy Audit for each Policy by mail using the United States Postal Service and/or by fax using interstate wires. In response to the Policy Audit question "Is the above referenced policy in force," PHL answered and represented "YES" for each Policy. The Policy Audit also confirmed the current death benefit for that Policy. The Policy Audits faxed and mailed to each Plaintiff fraudulently concealed, and failed to disclose, that PHL did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid. PHL faxed and mailed Plaintiffs the Policy Audits in furtherance of Defendants' plan to defraud

1    Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn

2    additional premium revenue for PHL which PHL does not intend to return.

3        130.   The Policy Audits faxed and/or mailed to Plaintiffs each affirmatively

4    misrepresented and fraudulently concealed facts from Plaintiffs.   When PHL

5    answered and represented "YES" in response to the question "Is the above

6    referenced policy in force," PHL knew and intended that the Plaintiffs would: (i)

7    believe that PHL intended to honor the Policy issued to it and pay the amounts

8    stated; and (ii) in reasonable and justifiable reliance on PHL's representations and

9    assurances, continue to pay premiums.   When PHL represented to a Plaintiff the

10   amounts of the current death benefit for that Plaintiff's Policy, PHL knew and

11   intended that the Plaintiff would: (i) believe that PHL intended to honor the Policy;

12   and (ii) pay the amounts stated and, in reasonable and justifiable reliance on PHL's

13   representations and assurances, continue to pay premiums.   The Policy Audits faxed

14   and mailed to Plaintiffs by PHL each falsely represented that PHL considered the

15   Policy in question "in force," valid and enforceable and that PHL had no plan to

16   challenge the Policy or deny benefits under the Policy.   PHL fraudulently concealed

17   that it has no intention of paying the amounts stated, and instead intended to deny

18   any claim for benefits and to confiscate all premiums paid.

19       131.   Notably, and in an egregious example of Defendants' fraudulent

20   practices, PHL sent such fraudulent Policy Audits to the John Doe Trust 1, John Doe

21   Trust 22, and Jane Doe Trust 43 and then sued to rescind the Policies owned by

22   these Trusts – which PHL had just represented were "in force" – less than two

23   months later.

24       **C.**   **PHL Unlawfully Increases Its Cost Of Insurance Charges As**

25            **Part Of Defendants' Plan To Destroy The Value Of Their**

26            **Policyholders' Policies And Force Policyholders To Lapse**

27            **Their Policies**

28       132.   PHL has also willfully breached the Policies and numerous other

policies in an attempt to intimidate Plaintiffs and other policyholders into lapsing their policies.   Phoenix Life has engaged in the same conduct with respect to policies it issued.  Such conduct is in furtherance of Defendants' scheme to evade its contractual obligations to Plaintiffs and other policyholders and gain a windfall by retaining many years worth of premiums paid for lapsed policies.

133.   The first way in which PHL has breached the Policies and other policies is by unlawfully raising the COI charges for the Policies, in direct violation of the terms of the Policies.  These breaches were done willfully and in bad faith, as their sole purpose was to attempt to force Plaintiffs, and other policyholders, into letting their Policies lapse and thus earning PHL an undeserved windfall.  These actions by PHL are identical to actions Phoenix Life has impermissibly taken with respect to policies it issued to certain of its policyholders.  Defendants are thus engaged in a concerted effort to breach their policies and improperly attempt to force their policyholders into letting their policies lapse to the policyholders' detriment and Defendants' benefit.

134.   The Policies each provide that they will remain in force as long as there are sufficient funds in the policy account to cover specific monthly deductions set forth in the Policies.  The most significant of these deductions is the COI charge, which reflects the price charged by PHL to cover the risk of paying the death benefit.  The COI charge is determined by multiplying the COI rate times the net amount at risk.

135.   The Policies allow PHL to change the COI rate, but only under very specific circumstances set forth therein.   Specifically, the Policies provide that changes in cost of insurance rates: (i) will be based on PHL's expectations of "future mortality, persistency, investment earnings, expense experience, capital reserve requirements and tax assumptions"; (ii) will "not discriminate unfairly within any class of insureds"; and (iii) "will not distribute past gains or recoup prior losses."

136.   Therefore, under the express terms of the Policies, PHL may only

change COI rates based on a change in PHL's expectation of mortality, persistency and other specified factors. Additionally, any change in the COI rates must be made on a uniform basis for all insureds in the same class and cannot be used to recoup PHL's prior losses.

137. The Policies' strict limitation on when COI rates may be increased is a material provision. The Policies are flexible-premium, universal life policies. This type of policy provides significant flexibility to the policyholder. A policyholder may choose to pay more into the account in premiums and accumulate tax-deferred interest. Or, if a policyholder wants to invest funds elsewhere, the policyholder may choose to pay only enough to cover monthly policy charges. If the COI rates could simply be increased whenever the insurer wished, the flexibility in premium payments which is the selling point of such policies would be wholly illusory.

138. Defendants marketed and sold their policies, including the Policies, as "flexible premium" policies, knowing that this flexibility would appeal to investors wishing to seek a competitive return on their investments and to avoid paying more premiums than needed to keep their policies in force. Among other things, Defendants represented that these policies: (i) give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments" (Press Release dated April 3, 2006); (ii) are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business needs" (Press Release dated April 3, 2006); and (iii) are "appropriate to those looking to minimize long term insurance costs while seeking competitive returns" (Press Release dated June 19, 2003).

139. Despite the explicit language in the Policies limiting the circumstances under which the COI rates may be increased, and the fact that Defendants heavily marketed such policies as permitting policyholders to pay the minimum premiums needed to keep their policies in force, PHL and Phoenix Life have twice unlawfully raised their COI rates, targeting the very policyholders who used their policies in the

way Defendants designed and marketed them.   Both increases were part of Defendants' overall scheme to force policyholders into allowing their policies to lapse; the second unlawful increase breached the Policies.  PHL and Phoenix Life have raised their COI rates in a targeted effort against policies they believe have become owned by investors, as investors frequently choose to pay only the minimum premiums required to keep a policy in force rather than attempting to build up the accumulated policy value.

140.   In March 2010, PHL and Phoenix Life began sending letters to a subset, but not all, of their universal life policyholders, announcing that a COI rate increase would affect their policies if their accumulated policy value was not high enough.  The letters stated in pertinent part:

> We are sending you this letter to inform you that on April 1, 2010, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies. Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 11/1/2010 unless your accumulated policy value is maintained at a sufficient level....The amount of the increase will vary based on the accumulated amount of your policy value.  In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate the increase.

141.   This first COI rate increase by PHL and Phoenix Life was unlawful in several respects.

142.   First, there is nothing in PHL's and Phoenix Life's policies that allows them to increase COI rates based on the accumulated policy value.  Indeed, the policies were marketed and purchased for the purpose of keeping the accumulated policy value low.